Laverne **KULLING**, individually and as personal representative of the Estate of Carl G. Kulling, Richard A. Beal, and William A. Scheib, Plaintiffs,

v.

**GRINDERS FOR INDUSTRY, INC.,** and Toyoda Machinery U.S.A. Corporation, Defendants.

No. 99–74339.

United States District Court, E.D. Michigan, Southern Division.

Feb. 28, 2002.

Jamimie R. Goodman, Detroit, MI, for plaintiff.

Nancy Sasamot, Musuda, Funal, Chicago, IL, Eric A. Michaels, Bloomfield Hills, MI, for defendant.

### OPINION AND ORDER REGARDING VARIOUS POST–TRIAL MOTIONS

ROSEN, District Judge.

### I. *INTRODUCTION*

Plaintiffs Laverne Kulling, Richard A. Beal, and William A. Scheib brought suit in this Court on September 3, 1999, alleging that Plaintiffs Beal and Scheib and Plaintiff Kulling's late husband, Carl G. Kulling, were unlawfully discharged from their employment with Defendant Toyoda Machinery U.S.A. Corporation ("Toyoda") and its wholly-owned subsidiary, Defendant Grinders For Industry, Inc. ("GFI"), in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.

§ 621 *et seq.*[1] This case was tried before a jury beginning on February 6, 2001, and the jury returned a verdict in each Plaintiff's favor on February 20, 2001, awarding amounts of $168,991 to Plaintiff Kulling, $332,701 to Plaintiff Beal, and $131,234 to Plaintiff Scheib. The Court entered a judgment on March 1, 2001 reflecting this verdict.

Several post-trial motions presently are pending before the Court. Defendants have moved for a new trial, and also have renewed their motion for judgment in their favor as a matter of law. Plaintiffs, for their part, have filed a motion for injunctive relief and a motion for attorney fees and costs. Each of these motions has been fully briefed. Having thoroughly reviewed the parties' submissions and the voluminous trial record, the Court has determined that oral argument would not significantly aid the decisional process, and that it is appropriate to decide the parties' post-trial motions "on the briefs." *See* Eastern District Local Rule 7.1(e)(2). This Opinion and Order sets forth the Court's rulings.

### II. *DEFENDANTS' MOTIONS FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND FOR NEW TRIAL*

#### A. The Standards Governing Defendants' Motions

In the first of their two post-trial motions, Defendants renew their request, first made at the close of Plaintiffs' proofs at trial, for judgment in their favor as a matter of law on Plaintiffs' ADEA claims. This motion is governed by Fed.R.Civ.P. 50, which states:

If during a trial by jury a party has been fully heard on an issue and there is

[1]. Plaintiff Kulling also asserted state-law wrongful death and loss of consortium claims, but these claims were dismissed in an Opinion and Order dated October 1, 2000. *See Kulling v. Grinders for Industry, Inc.,* 115 F.Supp.2d 828, 850–53 (E.D.Mich.2000).

no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

Fed.R.Civ.P. 50(a)(1). "Judgment as a matter of law is appropriate only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party." *Moore v. KUKA Welding Systems & Robot Corp.*, 171 F.3d 1073, 1078 (6th Cir.1999). In considering Defendants' motion, this Court may not "weigh the evidence, evaluate the credibility of the witnesses, or substitute [its] judgment for that of the jury." *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 825 (6th Cir.1997).

Alternatively, in the event that the Court does not enter a judgment in their favor as a matter of law, Defendants have filed a second post-trial motion requesting that they be granted a new trial. Under Fed.R.Civ.P. 59(a), this latter motion may be granted "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." This rule has been construed as encompassing such grounds as a verdict against the clear weight of the evidence, an inconsistent verdict, an excessive award of damages, an error of law during the trial, and prejudicial misconduct by the Court, opposing counsel, or a juror that deprived the moving party of a fair trial. *See* Robert E. Jones *et al.*, Federal Civil Trials & Evidence, ch. 20, ¶¶ 20:100–243 (2001 ed.). Not every such error may warrant a new trial, however:

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in any-thing done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Fed.R.Civ.P. 61. The Court will apply these standards in resolving Defendants' motions.

## B. Defendants' Motion for Judgment Notwithstanding the Verdict

In their renewed motion for judgment as a matter of law, Defendants identify six issues on which, in their view, Plaintiffs failed to present sufficient evidence to sustain a jury finding in their favor. These issues include: (i) whether Plaintiffs established that their discharges were motivated by impermissible considerations of age; (ii) whether Defendants willfully violated the ADEA in discharging Plaintiffs; (iii) whether Plaintiff Kulling was entitled to recover back pay and front pay beyond the date of Carl Kulling's death; (iv) whether Plaintiffs Beal and Scheib established an entitlement to back pay; (v) whether any of the Plaintiffs presented sufficient evidence to sustain an award of front pay; and (vi) whether any awards of back pay should have been offset by the severance payments made to Plaintiffs in connection with their discharges. The Court will address each of these points in turn.

### 1. Plaintiffs' Evidence of Age Discrimination Was Sufficient to Sustain a Jury Finding in Their Favor as to Defendants' Violation of the ADEA.

As their first ground for seeking a judgment notwithstanding the verdict, De-

fendants argue that Plaintiffs failed to introduce sufficient evidence at trial from which a jury could reasonably conclude that their discharges were motivated by impermissible considerations of age. In particular, Defendants contend that the evidence at trial established that Plaintiffs were terminated as part of a legitimate, economically motivated reduction in force, and that Plaintiffs were selected for discharge based on factors other than their age. Upon reviewing the trial record, however, the Court finds that the jury reasonably could have concluded otherwise.

As an initial matter, the Court observes that its ruling on Defendants' pre-trial motion for summary judgment is largely dispositive of the present issues, for the simple reason that the evidence at trial was highly similar, both in character and in substance, to the evidence before the Court as it denied Defendants' pre-trial motion. First, with regard to whether Defendants implemented a true reduction in force, the Court again recognizes, as it did before trial, that "while there are some indications of a genuine workforce reduction, other evidence points in the opposite direction." *Kulling*, 115 F.Supp.2d at 838. On one hand, the trial record indicated that, following Plaintiffs' terminations, their job duties were distributed among the remaining employees, with a net reduction in Defendants' total workforce. On the other hand, Defendants' claim of a workforce reduction was hardly unimpeachable, where their management testified that the selection of employees for discharge was based primarily upon a determination that certain positions were expendable, but where Plaintiffs produced ample testimony and documentary evidence—including some prepared by Defendants' own management—that other, far younger employees soon replaced them in these purportedly "expendable" positions. Plaintiffs also introduced evidence that,

within a few months after they were discharged, Defendants posted job openings for the division in which they had worked—including, arguably, job postings for the positions formerly held by the workers who had been promoted to replace Plaintiffs. In sum, while the thrust of Defendants' evidence was that the companies sought to cut costs by eliminating a layer of middle management, Plaintiffs countered this reduction-in-force theory through evidence that would permit the conclusion that there was no net reduction in middle-management positions.

In any event, as observed before trial, Defendants' appeal to a reduction in force does not operate as a complete defense to Plaintiffs' ADEA claims, so long as Plaintiffs have produced sufficient evidence from which a jury could find that Defendants unlawfully implemented this reduction in force—that is, "direct, circumstantial, or statistical evidence tending to indicate that the employer singled out [Plaintiffs] for discharge for impermissible reasons." *Kulling*, 115 F.Supp.2d at 838 (internal quotations and citation omitted). Just as they did in opposition to Defendants' pre-trial motion, Plaintiffs introduced each of these forms of evidence at trial: (i) direct evidence of statements by Defendants' management, made in connection with the challenged decisions, that the companies were "letting go of the older more senior people," (2/13/01 Trial Tr. at 831), that Plaintiff Beal was "the first of many retirement age employees to be let go," (*id.* at 757), and that Defendants' discharge decisions were part of a "corporate plan ... to bring younger employees up the corporate ladder," (2/12/01 Trial Tr. at 631); (ii) circumstantial evidence that cast doubt upon Defendants' appeal to economic hardship as a basis for their reduction in force, and that, as discussed above, tended to undermine Defendants'

stated non-discriminatory justification that they selected workers for discharge based upon their purportedly expendable middle-management positions; and (iii) expert testimony as to a statistically significant disparity between the ages of the employees selected for discharge and the ages of the retained workers.

In denying Defendants' motion for summary judgment, the Court found that the pre-trial record, "viewed as a whole, would permit the inference that Defendants selected Plaintiffs for discharge based on their age." *Kulling*, 115 F.Supp.2d at 840. Defendants have failed to identify any material respect in which the evidence at trial differed from this pre-trial record—and, as noted, the Court may not weigh this evidence or assess the credibility of witnesses, just as it could not do so in deciding Defendants' motion for summary judgment. Nor have Defendants identified any basis for the Court to depart from its pre-trial ruling that this record did not warrant the entry of judgment as a matter of law. Indeed, virtually all of the authorities cited in Defendants' post-trial motion, and all of their underlying contentions, were directly addressed in the Court's prior Opinion and Order.

In short, this aspect of Defendants' renewed motion for judgment as a matter of law merely rehashes the arguments presented in support of Defendants' pre-trial motion for summary judgment. The Court again holds, as it did on a similar record before trial, that Plaintiffs' evidence was sufficient to permit a reasonable jury to conclude that the challenged discharge decisions were motivated by impermissible considerations of age.

## 2. Plaintiffs Produced Sufficient Evidence of Willful Violations of the ADEA.

In their next challenge to the jury verdict, Defendants contend that Plaintiffs failed to present sufficient evidence at trial to sustain the jury's finding of willfulness. "To find willfulness, the jury had to conclude by the preponderance of the evidence that [Defendants] either knew or showed reckless disregard for the matter of whether [their] conduct was prohibited by the ADEA." *Skalka v. Fernald Environmental Restoration Mgmt. Corp.*, 178 F.3d 414, 423 (6th Cir.1999). The Court finds that the evidence here, while not overwhelming, was sufficient to meet this standard.

In *Skalka*, the Sixth Circuit upheld a jury's finding of willfulness where the plaintiff employee's "discharge involved a dramatic departure from established company procedures and was therefore highly 'visible' to top management." *Skalka*, 178 F.3d at 423. Based on this evidence, the Court held that "[t]he jury could reasonably have concluded that [the defendant employer] was aware that its oldest [employee within a particular job classification] was selected for a layoff through irregular procedures and that its failure to investigate and remedy the situation indicated reckless disregard for whether its managers were making discriminatory decisions." 178 F.3d at 423.

Plaintiffs have offered somewhat analogous evidence in this case. The testimony at trial indicated that Defendants generated no paper trail whatsoever in planning and implementing their reduction in force, nor did their senior management promulgate any guidelines to be followed, beyond dictating the number of employees to be let go. Yet, the management officials who testified at trial spoke of a seemingly coherent scheme to trim a layer of middle management that was deemed to be the most expendable. If, as Defendants' management contended at trial, the selection of particular employees for layoff was left to the individual department managers, it is

rather notable that each of these managers independently arrived at the same conclusion—namely, to target middle-management positions—without any direction to this effect from upper management.

In addition, Plaintiffs elicited somewhat inconsistent statements from Defendants' management as to the specific process through which the reduction in force was implemented, the particular individuals who were involved in this process, and the workers who would assume the duties previously performed by Plaintiffs. For example, Defendants indicated in discovery responses, later introduced at trial, that Edward McClymont did not participate in the planning or implementation of the reduction in force, but McClymont and others testified to the contrary. Likewise, other discovery responses, also introduced at trial, listed three specific employees as having "replaced" the three Plaintiffs, yet Defendants' management named different individuals—and, indeed, sometimes could not even agree among themselves—when asked at trial to identify the employees who had assumed Plaintiffs' job duties.[2] Further, as discussed earlier, Defendants' claim that they targeted "expendable" positions did not go unchallenged in the evidentiary record. All of this could lead a reasonable jury to find a degree of irregularity in the manner in which Defendants planned and carried out their workforce reduction.

More importantly, at least two members of Defendants' management—Mark Elliott, the human resources director, and Gary Blanchard, the vice president and general manager of Defendants' Grinding Machine Division—testified as to their concern upon discovering that *all* of the salaried employees who were selected for discharge were over 50 years of age. Yet, there was no evidence at trial that Elliott or Blanchard ever voiced these concerns to others, and Elliott specifically testified that he did not seek the advice of counsel on the matter. Rather, from their testimony, one could infer that Elliott and Blanchard merely satisfied themselves that there could be legitimate reasons for selecting the particular employees targeted for discharge, without exploring whether these were the *true* reasons. Indeed, and rather remarkably, one of the reasons given by Elliott for his lack of greater concern was that "the entire population of the work force [wa]s ... over 40," so that "it's not like I had a younger person to choose from," (2/12/01 Trial Tr. at 464–65)—but Elliott then confirmed that nearly a third of the work force was *not* over 40 years old, (*id.* at 465–66), and a response he prepared in discovery, offered by Plaintiffs at trial, identified the three "replacements" for Plaintiffs as ages 26, 35, and 40. Just as in *Skalka*, then, the jury could reasonably have concluded that Defendants' failure to investigate "indicated reckless disregard for whether [their] managers were making discriminatory decisions." *Skalka*, 178 F.3d at 423.

Finally, as noted earlier, Plaintiffs produced evidence at trial of express statements by Defendants' management suggesting that age-based criteria played a role in the selection of workers for discharge. Although Defendants challenged this evidence, the jury was entitled to give it credence. No member of Defendants' management claimed ignorance of the laws forbidding age discrimination in employment decisions. Thus, if Defendants nev-

**2.** Compare, for example, the testimony of Mark Elliott and Paul Lafief regarding the duties previously performed by Plaintiffs Beal and Kulling. Lafief testified that all of these duties were given to Charles Queener, (*see* 2/14/01 Trial Tr. at 930–31), while Elliott testified that many of these duties were assumed by other employees, (*see* 2/12/01 Trial Tr. at 482–86).

ertheless used age as a factor in their decisions, the jury readily could have concluded that Defendants acted with the knowledge that they were engaged in prohibited conduct. For all of these reasons, then, the Court declines to disturb the jury's finding of willfulness.

### 3. The Evidence at Trial Did Not Dictate that Plaintiff Kulling's Damages Be Limited to the Losses Incurred Prior to Carl Kulling's Death.

■ Defendants next contend that the evidence at trial was inadequate to sustain an award of back pay or front pay to Plaintiff Kulling for any period beyond Carl Kulling's death in January of 1998.[3] Again, the Court finds that the proofs at trial, while far from definitive, were sufficient to sustain the jury's award to Plaintiff Kulling.

Carl Kulling's suicide presents questions of proof not ordinarily encountered in determining awards of back pay or front pay. Specifically, in order to recover damages for any period beyond Mr. Kulling's death, Plaintiff first had to establish that Defendants' termination of Mr. Kulling's employment was a proximate cause of his suicide, and then had to introduce evidence upon which the jury could reasonably base its determinations of back pay and front pay. On closer inspection, however, these issues are capable of resolution under a fairly traditional "failure to mitigate" analytical framework. In essence, Defendants argued at trial that Carl Kulling failed to mitigate his damages by continuing to work, while Plaintiff asserted that any such failure to mitigate was chargeable to Defendants as a product of their wrongful discharge of Mr. Kulling.

Viewing the issues in this light, the Court is satisfied that the evidence at trial was sufficient to sustain the jury's verdict as to Plaintiff Kulling. Three witnesses gave testimony that would support the jury's finding of a causal connection between Mr. Kulling's wrongful discharge and his suicide just over two months later. First, Plaintiff offered the testimony of Dr. Sander Breiner, a psychiatrist who saw Mr. Kulling the day before his death. Dr. Breiner testified that he diagnosed Mr. Kulling as suffering from severe depression, and he opined that this depression was due to Mr. Kulling's recent discharge from his job with Defendants, which he had held for 25 years and was "his whole life to him, [the] most important thing he had going." (2/7/01 Trial Tr. at 133.) Dr. Breiner further testified that, in his opinion, Mr. Kulling's depression would have prevented him from continuing to work at the new job he had secured shortly after his discharge by Defendants. Dr. Breiner also opined that he "could not picture" Mr. Kulling ever returning to gainful employment. (*Id.* at 136.)

Next, Mr. Kulling's wife, Plaintiff Laverne Kulling, testified that her husband "became nonfunctional" after Defendants discharged him in November of 1997, (2/14/01 Trial Tr. at 855), and she attributed this to the loss of his job, along with his belief that he had been terminated because of his age. Mrs. Kulling recounted conversations in which her husband stated his belief that his discharge was age-based, but that he "didn't think he could prove that." (*Id.* at 858.) In addition, although Mr. Kulling had obtained a new job, Mrs. Kulling testified that he regularly came home from this job and stated, "I just don't think I can pull this

---

**3.** Defendants further assert that, as a matter of law, Carl Kulling's suicide served to cut off any entitlement to recover economic damages for the period after his death. This contention will be addressed below.

off," and that, on the day before his death, he stated his belief that he was "probably going to have to quit" this job. (*Id.* at 859, 868.) Similarly, the Kullings' daughter, Laura Bolyard, testified that her father was "very sad, depressed" after his discharge, and that he told her that he was "devastated" because "he thought he was let go because of his age." (*Id.* at 894.) She also testified about a number of routine household activities that her father was unable to perform after his discharge. The testimony of these three witnesses, if credited, would support the jury's determination that Mr. Kulling's discharge was a proximate cause of his suicide.

Moreover, as to the jury's specific back pay and front pay awards, the Court finds that these determinations were sufficiently anchored in the evidentiary record. Mrs. Kulling testified that her husband's total earnings for 1997 would have been approximately $45,000, had he not been discharged in November of that year, and Plaintiffs introduced Mr. Kulling's W–2 forms for 1995 through 1997 as further corroboration of this figure. The jury's award of $93,168 in back pay, for a period of over three years between Mr. Kulling's discharge and the date of the verdict, fully comports with this record. Likewise, given that Mr. Kulling was 60 years old on the date of his discharge, the jury did not act unreasonably in awarding $75,823 in front pay, a figure that would encompass less than two additional years of employment at Mr. Kulling's 1997 level of earnings. *See Schwartz v. Gregori,* 45 F.3d 1017, 1023 (6th Cir.1995) (upholding a four-year award of front pay, where "the parties had worked together for seventeen years").

At bottom, Defendants do not really take issue with any specific factual finding by the jury, nor do they argue that some different, lesser award of back pay or front pay is warranted by the record. Rather, they broadly dismiss the evidence offered in support of Plaintiff Kulling's claim for damages as "speculative" and "unreliable." According to Defendants, the question of causation as to Mr. Kulling's suicide presented "unresolvable proximate cause issues," and all of Plaintiff's evidence on this point was inadequate in some respect— Mr. Kulling's wife and daughter, for example, offered only "vague" and "medically unreliable" testimony about the cause of his suicide, while Dr. Breiner's opinion was based upon only a single session with Mr. Kulling. The jury's damage award merely compounded this problem, in Defendants' view, as it rested upon this purportedly unsupported foundation of a causal link between Mr. Kulling's discharge and suicide.

There are two answers to Defendants' protests on this point. First, that the proximate cause issue in this case might be difficult or unusual does not provide a basis in law for altogether prohibiting the jury from deciding the issue. Leaving aside, for the moment, Defendants' *legal* challenge to the propriety of an award of damages for the period beyond Mr. Kulling's death, the *factual* basis for such an award includes, as a component, the determination that Mr. Kulling's suicide did not constitute a failure to mitigate damages, but instead was chargeable to Defendants' unlawful conduct. Once Defendants suggested that Mr. Kulling's own actions cut off his estate's entitlement to additional damages, it was incumbent upon Plaintiff to answer this defense. To the extent that Defendants question whether Plaintiff Kulling's evidence was legally sufficient to permit the jury to side with her on this "failure to mitigate" defense, the Court has already found that it was. The weight to be given this evidence was for the jury to decide.

Next, the Court believes that Defendants' argument inappropriately conflates the distinct notions of uncertainty, which is inherent in nearly any factual determination, and speculation, which is not a permissible element of a jury verdict. To be sure, we cannot know to a certainty the triggering causes of Mr. Kulling's suicide. Further, it is not difficult to imagine a case in which more or stronger evidence is introduced as to the cause of a suicide; in particular, as Defendants point out, the psychiatric testimony offered by Plaintiff was based on a single visit with Mr. Kulling. Yet, the degree of uncertainty presented here is not at all uncommon in the law; rather, it is expressly acknowledged in the governing "preponderance" standard of proof. Moreover, it was Plaintiff, with her burden of proof, who arguably bore the risk that the jury would adjudge the evidence too "speculative" or fraught with uncertainty to establish a causal link between Mr. Kulling's discharge and his death. Upon assessing Plaintiff's evidence, however, the jury evidently concluded otherwise, and the Court cannot say that this conclusion was unreasonable under the record presented at trial.

Nor is it especially worrisome that this element of uncertainty might have had an effect on the calculation of damages. To the contrary, calculations of future damages necessarily must rest upon a degree of prediction. *See Shore v. Federal Express Corp.,* 42 F.3d 373, 378 (6th Cir.1994) (recognizing that "future damages are often speculative" (internal quotations and citation omitted)). The additional uncertainty introduced by the question of causation in this case does not fundamentally alter this balance, nor does it convert the jury verdict into the product of rank speculation. Indeed, to the extent that Defendants' unlawful conduct contributed to the speculation as to what Mr. Kulling might have done if he had not committed suicide, "[t]he most elementary conceptions of jus-

tice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *EEOC v. Prudential Federal Savings & Loan Ass'n,* 763 F.2d 1166, 1173 (10th Cir.1985) (internal quotations and citations omitted). Accordingly, the Court finds that any element of speculation in the jury's back pay and front pay awards to Plaintiff Kulling is insufficient to disturb the jury's verdict.

**4. Sufficient Evidence Was Presented to Sustain the Awards of Back Pay to Plaintiffs Beal and Scheib.**

Next, Defendants challenge the jury's awards of back pay to Plaintiffs Beal and Scheib as unsupported by the evidence at trial. Again, the Court takes a different view of the trial record.

■ Turning first to Plaintiff Beal, he testified that he was entitled to back pay damages of approximately $127,000, based on a final annual salary of $52,800 with Defendants, plus estimated 3.5 percent annual raises, $3,800 per year in lost insurance benefits, and his loss of 3 percent matching employer contributions to a 401(k) plan offered by Defendants. These amounts, over the slightly more than three year period between Beal's discharge and the end of trial, would total approximately $200,000. From this amount, Defendants would be entitled to deduct the $75,000 earned by Plaintiff Beal in his substitute employment in 1999 and 2000. The amount of back pay awarded by the jury, $114,604, comports with Plaintiff Beal's testimony, and the jury was entitled to credit this evidence in making its back pay determination.

Defendants argue, however, that Plaintiff Beal failed to mitigate his damages by making reasonable efforts to secure substitute employment, and that, even absent Defendants' reduction in force, Beal would

have lost his job in June of 1998 as a result of Defendants' elimination of the purchasing manager position he formerly held. Regarding the failure to mitigate, Beal testified to fairly extensive efforts to obtain substitute employment, and it was within the province of the jury to determine the weight to be given to this testimony. As for the purported elimination of the position formerly held by Plaintiff Beal, Defendants have not pointed to any specific portion of the trial record that would mandate this conclusion as a matter of law; rather, they suggest only generally that the proof can be found somewhere within the testimony of Mark Elliott. Apart from various inconsistencies in this testimony, as discussed earlier, and apart from the absence of any direct statement by Mr. Elliott establishing Defendants' claim that the purchasing manager's duties were consolidated into some more expansive and corporate-wide position for which Plaintiff Beal would not have been qualified, the Court notes the evidence in the trial record that the employee designated in Defendants' discovery responses as Beal's "replacement," Scott Miller, held this "replacement" position beyond June of 1998, when, according to Defendants, this position was eliminated. Consequently, the Court finds nothing unreasonable in the jury's rejection of Defendants' arguments against an award of back pay to Plaintiff Beal.

■ Next, regarding the jury's award of $45,938 in back pay damages to Plaintiff Scheib, Defendants correctly point out that the Court permitted Scheib to claim only $30,000 in back pay in his testimony at trial, in light of his failure to itemize damages beyond this amount in the parties' joint final pretrial order. Yet, in addition to this testimony, which fully comported with the Court's ruling, the jury was provided with Plaintiff Scheib's W–2 forms for his last three years of employment with Defendants, 1995–1997, as well as his first three years with his new employer, 1998–2000. Moreover, the jury also heard Plaintiff Scheib's testimony that he anticipated 3 percent annual raises from Defendants, and that Defendants made 3 percent annual contributions to a 401(k) plan, whereas his current employer did not. Combining this latter testimony with Scheib's W–2 form for 1996, the last full year of his employment with Defendants, and his W–2 forms for the years 1998–2000, the Court is able to calculate a difference of approximately $36,481 between Scheib's anticipated salary and 401(k) benefits with Defendants for calendar years 1998–2000 and his actual earnings with his current employer during that same period. Scheib further testified that he was out of work for approximately a month and a half after his discharge in November of 1997, which would have resulted in wage losses of approximately $8,286. Finally, Scheib testified that he began as a contract employee for his current employer, receiving substantially less pay until he was hired as a full-time employee in February of 1998, and that he previously received four weeks of paid vacation in his position with Defendants, versus only two in his current position. Given all this, the Court cannot say that the jury's award of $45,938 in back pay lacks support in the evidentiary record.

**5. The Jury Properly Was Allowed to Consider an Award of Front Pay to Each Plaintiff.**

■ Next, as a threshold legal issue, Defendants argue that the jury should not have been permitted to consider whether to award front pay to the three Plaintiffs. As Defendants point out, while the jury determines the amount of an award of front pay, the "determination of the propriety of an award of front pay is a matter for the court." *Roush v. KFC Nat'l Mgmt. Co.*, 10 F.3d 392, 398 (6th Cir.1993).

The factors to be considered include (i) the employee's duty to mitigate; (ii) the availability of employment opportunities; (iii) the time within which, through reasonable efforts, the plaintiff might have secured substitute employment; (iv) the employee's work and life expectancy; and (v) "other factors that are pertinent [to] prospective damage awards." *Roush*, 10 F.3d at 398 (internal quotations and citation omitted). Defendants assert that these factors militate against any award of front pay in this case. The Court cannot agree.

Front pay is "an available form of equitable relief in ADEA actions," where the "presumptively favored" relief of reinstatement is deemed inappropriate under the circumstances. 10 F.3d at 398. These circumstances include cases "where the plaintiff has found other work, where reinstatement would require displacement of a non-culpable employee, or where hostility would result." 10 F.3d at 398. At least two of these considerations are present here with respect to Plaintiffs Beal and Scheib. In particular, both ultimately found other, somewhat comparable employment. Further, accepting as true Defendants' economic justification for the challenged reduction in force—and the evidence at trial largely confirmed Defendants' claim of an overall workforce reduction—it seems likely that the reinstatement of Beal and Scheib would have necessitated the discharge of other employees. Moreover, the Court notes the absence of any evidence that Defendants have ever offered to reinstate Beal and Scheib, nor have Defendants ever contended, either at trial or in their post-trial submissions, that reinstatement was an available option. In fact, both Beal

and Scheib testified at trial that they would have accepted lower-paying jobs as an alternative to their discharges, but that no such offer was forthcoming. Finally, as for Mr. Kulling, reinstatement plainly is not an available remedy. In light of all this, the Court finds as a threshold matter that the preferred relief of reinstatement is not appropriate in this case.

■ Turning, then, to the specific factors outlined in *Roush*, the Court finds that they support the Court's ruling that the jury should be permitted to consider awards of front pay. Regarding Plaintiff Scheib, there is no question that he promptly sought to mitigate his damages by obtaining substitute employment. While Defendants argue that Scheib's current position is comparable in all relevant respects to his previous one, thereby overcoming any claim to front pay as a "make whole" remedy, the record at trial indicated otherwise, reflecting (i) consistent year-to-year increases in pay during his years with Defendants, contrary to their claim that Scheib received no raises after April of 1995; and (ii) pay rates at Scheib's current job which, while also increasing, left him lagging several thousand dollars behind what, under a fair reading of the evidence, he would have received had he remained in Defendants' employ.[4] Moreover, the Court already has noted the differences in benefits in Scheib's former and current positions.

In sum, Plaintiff Scheib did all that one reasonably could ask to secure substitute employment, yet still fell short of obtaining wholly equivalent pay and benefits. This effort satisfies several of the *Roush* factors

---

**4.** Indeed, one need only compare Scheib's W-2 forms for 1996, his last full year of employment with Defendants, and 2000, the last full year for which salary figures are available for his current position. These two forms reflect

virtually identical wages, despite the passage of several years in which Scheib presumably would have been awarded pay increases if he had remained with the same employer.

and, hence, it was appropriate to permit the jury to consider an award of front pay to remedy Scheib's shortfall in salary and benefits. Further, the actual amount awarded by the jury, $39,358, was reasonable under the facts presented at trial. In particular, the testimony and evidence would readily support at least a $7,500 per year differential in pay between Scheib's current and former positions, plus approximately $2,000 per year in lost 401(k) plan contributions. Plaintiff Scheib was 63 years old as of the date of trial, and testified that he hoped to work until age 70. The jury's award of roughly four years of front pay, well under the $60,000 in front pay sought by Plaintiff Scheib, was wholly reasonable under this record.

■ Plaintiff Beal presents a more difficult question. At age 53 at the time of his discharge, he was somewhat younger than the other Plaintiffs, and presumably would have had less difficulty in securing substitute employment. However, he did not do so until January of 1999, over a year after his discharge, and his initial job, which he held until June of 1999, was by no means comparable to his position with Defendants. Yet, as noted earlier, Beal testified to nearly daily efforts to find substitute employment, beginning in January of 1998. The jury evidently credited this testimony, and Defendants did little to counter it, apart from noting that Beal had produced little or no documentation to corroborate his job-hunting efforts. In addition, there is no dispute that Plaintiff Beal had secured a somewhat comparable job several months before trial, and hence before the front pay period began. In short, this is not a case of a wholesale failure or refusal to mitigate damages and, if Beal's testimony is credited, he made reasonable efforts at mitigation.

On balance, then, the Court finds that it was appropriate to let the jury decide what amount of front pay, if any, should be given to Plaintiff Beal. Further, the Court concludes that the jury's $103,493 front pay award, while admittedly at the high end of the range supported by the evidence, nevertheless *was* within this range. Beal testified to an approximately $10,000 annual differential in pay between his current and former positions, plus lost insurance benefits and matching employer 401(k) contributions, and he testified that he planned to work until he was 67, or roughly 11 years past the date of trial. The jury's front pay award comports with this testimony, and the jury was entitled to credit Beal's statements in making its front pay determination.

■ Finally, the Court has little difficulty in concluding that it was proper to allow the jury to consider a front pay award to Plaintiff Kulling. Obviously, Defendants took the position that Mr. Kulling largely failed to mitigate his damages; just as obviously, Plaintiffs claimed otherwise, charging Defendants with responsibility for Mr. Kulling's lack of mitigation. The Court believes that this sort of hotly-contested factual issue is best decided by the jury, and the jury elected to adopt Plaintiffs' view of the evidence.

In light of this determination—which, as explained earlier, enjoyed sufficient support in the record—it clearly was appropriate to let the jury decide the amount of front pay to be awarded. Indeed, accepting the jury's finding that Defendants' unlawful conduct played a role in Mr. Kulling's suicide, it is difficult to imagine a stronger case for an award of front pay. Moreover, the Court already has found that the amount actually awarded was reasonable. Finally, to the extent that Defendants suggest that the uncertainty surrounding Mr. Kulling's suicide should be considered a "pertinent factor" under *Roush* that militates against an award of front pay, the Court reiterates its view

that this causation issue is not altogether different in nature from the troublesome matters of prediction that are inherent in any award of front pay.

### 6. Plaintiffs' Damage Awards Need Not Be Offset by the Amounts They Received Under Their Severance Agreements.

As the final ground in support of their motion for judgment notwithstanding the verdict, Defendants contend that Plaintiffs' awards of back pay damages must be offset by the amounts they received from Defendants in exchange for executing releases and severance agreements upon their discharge.[5] The Court, however, finds that the law does not require such setoffs under the circumstances presented here.

The case law on this point admittedly is less than definitive. Recently, in *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 118 S.Ct. 838, 139 L.Ed.2d 849 (1998), the Supreme Court held that the common-law doctrines of "tender back" and ratification had been displaced by the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f)(1), in the context of waivers of ADEA claims. Accordingly, in the present case, where Plaintiffs claim (and Defendants do not dispute) that the releases they signed at the time of their discharge did not comport with the OWBPA, Plaintiffs need not have tendered back their severance payments before bringing suit under the ADEA. On the issue of setoff, however, the Supreme Court observed:

> In further proceedings in this or other cases, courts may need to inquire wheth-
er the employer has claims for restitution, recoupment, or setoff against the employee, and these questions may be complex where a release is effective as to some claims but not as to ADEA claims. We need not decide those issues here, however. It suffices to hold that the release [in this case] cannot bar the ADEA claim because it does not conform to the statute. Nor did the employee's mere retention of moneys amount to a ratification equivalent to a valid release of her ADEA claims, since the retention did not comply with the OWBPA any more than the original release did.

*Oubre*, 118 S.Ct. at 842.[6] Thus, *Oubre* expressly reserves the question whether an employer, such as Defendants here, may seek to recover all or a portion of a severance payment, having failed to receive the full "benefit of the bargain" in light of the invalidity of an employee's release under the OWBPA.

Prior to *Oubre*, however, the Sixth Circuit addressed this issue in *Howlett v. Holiday Inns, Inc.*, 120 F.3d 598 (6th Cir. 1997). *Howlett* anticipated the ruling in *Oubre*, holding that an employee need not tender back a severance payment before bringing suit under the ADEA. The Court then turned to the separate question whether an employee should be "allowed to retain the consideration paid for an invalid bargain." *Howlett*, 120 F.3d at 602. The Court answered this question in the affirmative, for two reasons. First, the Court found that this result would better serve the purposes of the OWBPA in cases where the employer has no other incentive to comply with the statute—*i.e.*, where

---

5. Specifically, Mr. Kulling received $17,138.70 in severance pay, Plaintiff Beal received $25,350.00, and Plaintiff Scheib received $12,964.98.

6. In a concurring opinion, Justice Breyer suggested that, once an employee has brought suit, thereby avoiding his promise not to sue, "nothing in the statute prevents his employer from asking for restitution of his reciprocal payment." 118 S.Ct. at 844 (Breyer, J., concurring).

"the employer knows that it has impermissibly discriminated based on age and that the OWBPA information will likely demonstrate such discrimination." 120 F.3d at 602.

Next, and more importantly, the Court cited "practical considerations" in support of the employee's retention of the severance payment:

> In the case before us, as in most instances, there has been no determination of the amount of the consideration allocable to the ADEA waiver versus the amount paid for release of other potential claims .... [The defendant's] former employees explicitly released the defendant from liability for numerous claims and ... we may infer that [the defendant] believes it has paid for the release of a number of [non-ADEA] claims. It would be extremely difficult, if not impossible, for the district court to identify all the potential theories of liability that these former employees have waived in consideration for money payments. And it would be impossible to assign meaningful values to all those potential claims and then apportion some of the consideration for the ADEA claims, and the rest for the remaining claims.
>
> ... [The defendant] can hardly complain about the inequity of losing the benefit of its bargain, when it did not even attempt to comply with the minimal requirements of the OWBPA. And, we will not impose the impossible task on district courts of separating out the consideration paid for ADEA waivers from that paid for all other claims, especially in light of the relative ease with which employers could avoid such complications by complying with the OWBPA.

*Howlett,* 120 F.3d at 602–03.

In this case, Plaintiffs waived a number of other claims, including any possible state-law age discrimination claims, by signing the severance agreements. If Plaintiffs had been able to successfully assert such state-law claims, they could have sought forms of relief beyond those available under the ADEA, such as emotional distress damages. *See Moody v. Pepsi–Cola Metro. Bottling Co.,* 915 F.2d 201, 209–10 (6th Cir.1990). Indeed, as to Plaintiff Kulling, the waiver given to Defendants has proven to be particularly significant, as the Court has ruled that Mr. Kulling waived any state-law wrongful death claim by executing a severance agreement and accepting a severance payment upon his termination. Under *Howlett,* this Court need not attempt the near-impossible task of apportioning Plaintiffs' severance payments among their ADEA and other potential claims, and then determining the appropriate amounts to setoff against the back pay damages Plaintiffs have been awarded under the ADEA.

Admittedly, *Howlett* was decided before *Oubre,* and *Oubre* suggests that an employer might be able to pursue a restitution or setoff claim against an employee, even though determining the amount of such a setoff might be "complex" in the case of waivers of multiple claims. However, the Supreme Court expressly declined to decide this issue, thereby leaving intact the ruling in *Howlett.* Finally, while Defendants suggested in a pre-trial brief that *Howlett* should be limited to cases where the employer has utterly failed to comply with any of the requirements of the OWBPA, a careful reading of the Sixth Circuit's decision indicates that this was only one of several factors relied upon by the Court. Accordingly, following *Howlett,* this Court finds that the jury's awards of back pay damages to Plaintiffs need not be offset by the severance payments they received upon their discharge.

816

## C. Defendants' Motion for New Trial

In their second post-trial motion, Defendants argue that they are entitled to a new trial on a variety of grounds. First, with regard to the award of damages to Plaintiff Kulling for the period beyond Mr. Kulling's death, Defendants contend: (i) that such damages are unavailable as a matter of law; (ii) that, in light of certain pre-trial rulings which Defendants construe as precluding such damages, Defendants were unfairly prejudiced and surprised by the Court's decision shortly before trial to permit Plaintiff Kulling to pursue such a recovery; (iii) that, having allowed Plaintiff Kulling to seek such damages, the Court should have severed her trial from those of Plaintiffs Beal and Scheib; and (iv) that the Court's instructions to the jury as to such damages were improper in various respects. Next, Defendants assert that the trial was unfairly influenced by the introduction of the report and testimony of Plaintiffs' statistical expert, Dr. Nitin V. Paranjpe. The Court finds that Defendants' various complaints of unfairness and legal error are wholly unfounded.

### 1. The Jury's Award of Damages for the Period Beyond Mr. Kulling's Death Does Not Provide a Basis for a New Trial.

■■■ As noted, Defendants have raised a variety of challenges to the jury's award of back pay and front pay for the period beyond Mr. Kulling's death. Turning first to Defendants' legal challenge to this award, the Court observes, as an initial matter, that Defendants have identified absolutely no support for their position. It contributes nothing to state, as Defendants do, that pain and suffering and emotional distress damages are not available under the ADEA; indeed, this Court already has made precisely this ruling in its pre-trial Opinion and Order in this case. *See Kulling,* 115 F.Supp.2d at 843. The jury instructions and verdict form did not depart

from this ruling, but expressly limited Plaintiff Kulling's recovery to back pay and front pay damages. Moreover, as discussed earlier, the amounts of back pay and front pay actually awarded to Plaintiff Kulling are fully in line with this limitation, and in no way suggest either the jury's belief that additional forms of damages were available, or an attempt by the jury to circumvent the law as explicated by the Court.

Next, while Defendants are correct that, so far as the Court is aware, no case has awarded damages under the ADEA for a period beyond the date of an employee's death, Defendants likewise have identified no ADEA case in which damages were deemed to be cut off as of the date of the employee's death. The case law simply is not instructive on this specific point. Yet, the *principle* underlying the Court's ruling here *has* been recognized in other cases. For example, as Plaintiffs point out, in *Lathem v. Department of Children & Youth Servs.,* 172 F.3d 786, 794 (11th Cir. 1999), the Court addressed a Title VII sex discrimination case in which the plaintiff had been awarded back pay for the entire period from her discharge through trial, despite her inability to obtain other employment due to a disability. The District Court allowed this award, determining upon its review of the evidence that the defendant employer's "conduct caused [the plaintiff's] disability and that this disability precluded her from obtaining other employment." *Lathem,* 172 F.3d at 794. The Eleventh Circuit affirmed this relief, holding that "a Title VII claimant is entitled to an award of back pay where the defendant's discriminatory conduct caused the disability." 172 F.3d at 794.

The ruling in *Lathem* fully comports with the traditional understanding of the "failure to mitigate" defense, and applies with full force here. In arguing that

Plaintiff Kulling's damages should be limited to those losses incurred as of the date of Mr. Kulling's death, Defendants essentially have advanced a "failure to mitigate" defense, contending that Mr. Kulling's suicide was a volitional act that prevented him from minimizing his damages by securing and retaining other employment. Faced with such a defense, Plaintiff Kulling here, just like the plaintiff in *Lathem*, was entitled to introduce evidence that any failure to mitigate was attributable to the employer's discriminatory conduct, and not the employee's own actions.[7] Defendants have identified no authority in support of their position that the *degree* of the lack of mitigation or the reasons therefor—mere inability to work versus severe incapacity or even death—should trigger different rules or standards of proximate cause.

Indeed, it would be strange if an employer could be held liable for causing a lesser degree of disability through its discriminatory conduct, but would be deemed free of liability for more severe consequences of its actions. Nor, as discussed earlier, can the Court accept Defendants' suggestion that the alleged consequences in this case, severe emotional trauma and suicide, are of a sort that renders them insusceptible of proof or unsuitable for determination by a jury under a "preponderance of the evidence" standard. Rather, while the question admittedly is a novel one, the Court finds that the jury properly was asked to determine whether Mr. Kulling's failure to mitigate his damages was attributable to Defendants' discriminatory conduct.

Defendants next contend, however, that the Court's pre-trial rulings led them to reasonably conclude that this issue would not be submitted to the jury, and resulted in unfair prejudice and surprise when it was. In particular, Defendants quote from a footnote in the Court's pre-trial Opinion and Order stating that, in light of the Court's ruling on Plaintiff Kulling's state-law wrongful death claim, "the cause of Mr. Kulling's suicide ... has [no] remaining relevance to the outstanding ADEA claims," and that "the circumstances surrounding Mr. Kulling's death will have no effect on the relief recoverable by Mrs. Kulling." *Kulling*, 115 F.Supp.2d at 853 n. 25. Defendants' claim of surprise, however, ignores both the context of the Court's statements and, more importantly, the entire course of proceedings *between* the issuance of this Opinion and the commencement of trial.

First, it must be recalled that the above-quoted statements were made as part of the Court's rulings on Defendants' motion for summary judgment, in which Defendants mounted various challenges to Plaintiffs' substantive theories of liability. The Court granted this motion in part and denied it in part, allowing Plaintiffs to go forward only on their age discrimination claims under the ADEA. In so ruling as to questions of liability, the Court had no occasion to address the precise contours of the back pay and front pay relief available to Plaintiffs under the ADEA, nor the legal standards that would govern any such awards. Simply put, Defendants never raised any issue of damages in their

---

**7.** When presented with Defendants' objection at trial to the admission of such evidence—specifically, Dr. Breiner's professional opinion as to the precipitating cause of Mr. Kulling's suicide—the Court held that this evidence cleared the "rather low threshold hurdle" of Fed.R.Evid. 104(a), and that its ultimate relevancy was to be determined under the standards of Fed.R.Evid. 104(b), subject to the introduction of sufficient evidence to permit the jury to find a causal link between Defendants' discriminatory conduct and Mr. Kulling's suicide. (2/7/01 Trial Tr. at 197–99.) As discussed earlier, the Court finds that the evidence at trial was sufficient to permit such a finding.

motion, but argued only matters of liability.

In that context, the Court's statements were entirely accurate—namely, that issues of causation as to Mr. Kulling's suicide had no bearing upon the question whether Defendants faced liability for alleged violations of the ADEA, nor upon the question, decided in Defendants' favor, of Defendants' potential liability under the state-law wrongful death theory of recovery advanced by Plaintiff Kulling. Consequently, in the footnote now cited by Defendants, the Court denied certain ancillary motions as moot, reasoning that these pending motions presupposed the relevance of this causation issue. Given the matters of liability that were then before the Court, this issue appeared to be irrelevant to any further proceedings.

However, it soon became apparent to all, the parties and the Court alike, that this issue of causation might be relevant after all, albeit on the entirely distinct question of back pay and front pay relief under the ADEA.[8] For example, in a proposed joint final pretrial order submitted by the parties on December 8, 2000, fully two months before trial, Plaintiffs stated:

> Laverne Kulling on behalf of the estate of Carl G. Kulling is entitled to recover all economic damages recoverable under the remedial statute ADEA that her deceased spouse would have been entitled to recover as if he was still alive that were caused by [Defendants'] age discrimination. Laverne Kulling will seek economic damages itemized in the form of back pay, lost benefits, five weeks of paid vacation, overtime, lost 401(K) benefits, estimated merit increases of 3 percent per year, front pay, lost future earnings and earnings capacity . . . . It was anticipated that Mr. Kulling had planned to work at least until age 70 if not beyond. Mr. Kulling was unable to continue working due to the emotional devastation, and loss of self esteem he suffered caused by [Defendants'] age discrimination.

(Joint Final Pretrial Order at 38.)

The record is replete with demonstrations of Defendants' awareness of this theory of damages, and of their position that Plaintiff Kulling should not be permitted to pursue this theory. For example, in the very same joint final pretrial order, Defendants argued that "[b]ecause of [Mr. Kulling's] death on January 18, 1998, Plaintiff Kulling cannot recover front pay." (*Id.* at 13.) Similarly, in a motion in limine filed on December 11, 2000, Defendants sought to preclude any reference at trial to the cause of Mr. Kulling's death. Then again, in a motion filed on January 22, 2001, Defendants expressly acknowledged that Plaintiffs' counsel had stated his intention at a December 14, 2000 pretrial conference to pursue front pay relief on behalf of Plaintiff Kulling, and Defendants repeated their contention that such a recovery should be barred as speculative and without legal basis.

In short, in the several months between the issuance of the Court's October 1, 2000 Opinion and Order and the commencement of trial, the parties hotly and repeatedly debated the form and extent of relief that Plaintiff Kulling could seek to recover un-

---

**8.** Despite this realization, the Court notes that its rulings would have been no different on the ancillary motions addressed in its pre-trial Opinion. Some—*e.g.,* Defendants' motion to compel a psychiatric examination of Mrs. Kulling—were still moot, while others—*e.g.,* Plaintiffs' motion to quash Defendants' notice of the deposition of Dr. Breiner, the psychia- trist who saw Mr. Kulling the day before his death—involved discovery disputes that the parties failed to bring to the Court's attention during the discovery period. The remaining motion, in which Defendants requested that Plaintiff Kulling's claims be tried separately from those of Plaintiffs Beal and Scheib, is addressed below.

der the ADEA. While Defendants might well have wished to construe the Court's Opinion and Order as having already resolved this issue, and might have hoped to persuade the Court to adopt this view, it surely was evident to Defendants *both* that this issue was not before the Court at the time it issued its October 1 Opinion, *and* that Plaintiffs held a very different view of the meaning and legal import of this Opinion. Thus, until the Court actually ruled on this issue on the eve of trial, Defendants could not—or, at a minimum, *should* not—have been confident of its ultimate disposition, one way or the other.[9] Defendants might be dissatisfied with this disposition, but this is hardly a basis for claiming an unfair trial.

Indeed, under the circumstances presented here, it is particularly disingenuous for Defendants to suggest that they were misled or somehow prejudiced by the Court's October 1 ruling. In their summary judgment motion that led to this Opinion, Defendants did not raise a broad legal challenge to Plaintiff Kulling's ability to recover wrongful death damages; rather, they argued, as an factual matter, that the record failed to support Plaintiff's claim of a causal connection between Mr. Kulling's discharge and his suicide. It was only through the Court's own efforts and research that it was determined that Plaintiff Kulling could not recover wrongful death damages, either under the ADEA or under a separate wrongful death claim. *See Kulling,* 115 F.Supp.2d at 842. In contrast, if the Court had merely ruled on the issue raised in Defendants' motion, summary judgment would not have been awarded on the claim for wrongful death damages because, as explained earlier,

Plaintiff Kulling clearly *did* produce sufficient evidence to raise a genuine issue of fact as to a possible causal link between Mr. Kulling's discharge and his suicide. Thus, if Defendants had been left to their own devices, the evidence of Mr. Kulling's suicide still would have been admissible at trial, but for the far broader purposes of determining whether to award wrongful death damages and in what amount. It is ironic, then, to say the least, that Defendants now complain of prejudice from a ruling that sharply limited the purposes for which Plaintiffs could offer evidence of Mr. Kulling's suicide, and substantially reduced the range of possible jury verdicts faced by Defendants.

Moreover, because of the narrowly circumscribed purpose for which Plaintiffs were permitted to offer evidence of the events surrounding Mr. Kulling's suicide, Defendants were not unduly prejudiced by the Court's refusal to sever Plaintiff Kulling's ADEA claim from those of Plaintiffs Beal and Scheib. If separate trials had been ordered, much of the same evidence would have been introduced in both proceedings, including all of the testimony and evidence regarding Defendants' implementation of their reduction in force. And, of course, each of the Plaintiffs was discharged on the very same day, and under highly similar circumstances. In contrast, Plaintiffs presented only two additional witnesses, Dr. Breiner and Mr. Kulling's daughter, to testify about the events surrounding Mr. Kulling's suicide, and the testimony offered by these two witnesses was quite brief. Thus, the Court does not view the unique circumstances of Plaintiff Kulling's case as the

---

9. It is worth noting that, even if the Court *had* ruled on this issue in its October 1 Opinion, such a ruling would have been non-final and "subject to revision at any time before the entry of judgment." Fed.R.Civ.P. 54(b). If, as Defendants now claim, they viewed the Court as departing from its earlier ruling, they could have requested an adjournment of the trial to address this purportedly "new" development. Tellingly, they did not do so.

tail wagging the dog of Plaintiffs' ADEA claims.

Nor does the Court find any compelling evidence of potential or actual prejudice or undue sympathy in the trial or jury verdict. During Dr. Breiner's testimony, at the request of defense counsel, the Court expressly instructed the jury as follows:

> Ladies and gentlemen, Dr. Breiner's testimony is offered to help you assist in making a determination as to whether or not Mr. Kulling would have been able to go back to work at either the job he then had or at his previous job, or even at any job. You cannot use this testimony or anything that Dr. Breiner has indicated in his opinion, with respect to concluding anything other than issues affecting Mr. Kulling's potential economic damages. In other words, Dr. Breiner's testimony is not offered for purposes of providing the basis for any damages other than potential wage loss damages in the future. As I will instruct you, damages for pain and suffering, emotional distress, those sorts of things, are not available in this particular action.

(2/7/01 Trial Tr. at 138–39.) Similarly, at the close of trial, the jury was instructed that only back pay and front pay damages could be awarded to Plaintiff Kulling, and that such damages could be awarded only if the jury determined by a preponderance of the evidence (i) that Defendants' termination of Mr. Kulling, in addition to being unlawful under the ADEA, was the proximate cause of his subsequent depression, and (ii) that this depression, in turn, was a triggering cause of his death. Further, the Court instructed the jury that each Plaintiff's claim and damages must be evaluated separately.

The Court finds no basis for concluding that the jury disregarded these instructions. To the contrary, as discussed earlier, the jury's award to each Plaintiff was

within the range supported by the evidence, and thus does not give rise to an inference of passion or undue sympathy arising from the unique circumstances of Plaintiff Kulling's case. Accordingly, the Court holds that Plaintiffs' ADEA claims were properly tried in a single proceeding.

Finally, regarding Defendants' challenges to the jury instructions and verdict form, these rest principally on Defendants' overarching contention that it was improper to permit the jury to consider an award of damages for any period beyond the date of Mr. Kulling's death. The Court already has rejected this proposition. To the extent that Defendants object to particular language in the instructions or verdict form addressing the issue of proximate cause, they have proposed no language that might have conveyed this concept more faithfully or clearly. Under the novel circumstances presented in this case, the Court finds that the jury instructions and verdict form accurately stated the governing law, and adequately informed the jury as to the findings necessary to warrant an award of damages for the period beyond the date of Mr. Kulling's suicide.

**2. There Was No Error In the Introduction at Trial of Plaintiffs' Expert Report and Testimony.**

As their final basis for seeking a new trial, Defendants argue that they were unfairly prejudiced by the introduction of the report and testimony of Plaintiffs' statistical expert, Dr. Nitin V. Paranjpe. The Court, however, finds no error, prejudicial or otherwise, in the admission of this evidence.

Defendants first argue that the small sample size of the data used by Plaintiffs' expert undermines the probative value of his opinion. The Court already has addressed and rejected precisely the same contention in its pre-trial Opinion and Or-

der, stating that "even where a statistical analysis is not as probative as [it] perhaps may have been, it nevertheless may serve to increase the likelihood that the decisions to eliminate certain positions were based on age." *Kulling,* 115 F.Supp.2d at 839 (internal quotations and citation omitted). The Court then held that Dr. Paranjpe's analysis achieved this limited purpose, and Defendants have identified no basis for the Court to depart from this ruling.

Next, to the extent that Defendants challenge Dr. Paranjpe's methodology, the Court notes that even Defendants' own statistical expert, Dr. John Sase, did not contend at trial that this methodology was fundamentally flawed. Rather, Dr. Sase largely questioned only the conclusions his counterpart drew from the data. Specifically, using the same limited set of data, Dr. Sase observed that the average age of Defendants' workforce dropped only slightly as a result of the reduction in force, while Dr. Paranjpe instead chose to compare the average ages of the employees who were discharged and those who were retained. Dr. Sase opined that his counterpart's approach would not necessarily support an inference of discrimination, because the age difference found by Dr. Paranjpe could equally well be explained through Defendants' account of the reduction in force: namely, that Defendants sought to trim a layer of middle management, which just happened to be skewed toward older individuals. The jury could have chosen to accept this explanation of the statistical evidence, but it was by no means compelled to do so—particularly where, as noted earlier, not one member of Defendants' senior management testified to a coherent plan, formulated in advance and passed down the chain of command, that the companies' reduction in force was to be targeted at middle management positions.

In short, each side's expert applied a valid methodology to the same limited set of data, and then presented a conclusion in support of his clients' position. Indeed, both experts essentially agreed that, if they were to accept as true the position taken by the opposing party, their statistical analysis would not conclusively disprove this hypothesis. Both recognized, in other words, that they were working with a small sample size, and that nothing definitive could be said through statistical analysis of this limited data. Under these circumstances, where the jury was presented with competing expert opinions and a complete picture of the bases upon which they rested, it was properly left to the jury to decide how much weight, if any, to give to each expert's testimony. This expert testimony, then, provides no basis for ordering a new trial.

## III. PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF

By motion filed on March 26, 2001, Plaintiffs ask that various sorts of injunctive measures be imposed upon Defendants, including: (i) an order permanently enjoining them against any further selection of employees for discharge or layoff on the basis of age; (ii) a requirement that Defendants, for a period of five years, report all terminations or layoffs of salaried employees over the age of 50 to a "special monitor" appointed by the Court; (iii) an injunction against the discharge or layoff of any such salaried employee unless Defendants first provide the special monitor with a written justification demonstrating that their decision was not based on age; (iv) an order directing Defendants' president to attend annual training sessions regarding age discrimination; and (v) a requirement that, for the next five years, Defendants provide any employee over the age of 50 who is discharged or laid off as a result of economic conditions

with a preferential opportunity to fill any job that is available at one of Defendants' facilities and for which the employee is qualified. The Court declines, under the circumstances of this case, to award the far-reaching injunctive relief sought by Plaintiffs.

▮ As Plaintiffs point out, awards of injunctive relief are authorized under the ADEA. *See* 29 U.S.C. §§ 626(b), (c)(1); *see also EEOC v. Johnson & Higgins, Inc.*, 91 F.3d 1529, 1542 (2d Cir.1996). "A district court has broad discretionary powers to craft an injunction to the specific violations found to ensure that the employer complies with the law." *EEOC v. Wilson Metal Casket Co.*, 24 F.3d 836, 842 (6th Cir. 1994). An injunction, if entered, should be tailored to "enjoin conduct which has been found to have been pursued or is related to the proven unlawful conduct." 24 F.3d at 842. However, "[w]hen there is no proof of a pattern or practice of discrimination, an injunction barring an employer from continuing alleged discriminatory practices is not appropriate." *Drez v. E.R. Squibb & Sons, Inc.*, 674 F.Supp. 1432, 1438 (D.Kan.1987). Rather, in order to obtain injunctive relief against future transgressions, "the moving party must demonstrate that there exists some cognizable danger of recurrent violations, something more than a mere possibility, which serves to keep the case alive." *EEOC v. General Lines, Inc.*, 865 F.2d 1555, 1565 (10th Cir. 1989).

Although Plaintiffs repeatedly assert that the evidence at trial demonstrated a pattern of age discrimination that warrants permanent injunctive relief, the Court does not share this view of the record. The discharges at issue in this case all occurred on the same day, as part of a single, relatively modest 20–employee reduction in force ordered by Defendants' senior management. While the jury found that Defendants' violations of the ADEA

were willful, there was no evidence of a broader pattern of unlawful discharges, nor of an established, deliberate policy through which Defendants inappropriately selected older workers for termination. To the contrary, the testimony at trial indicated that Defendants proceeded on a somewhat *ad hoc* basis in this case, delegating the specific reduction-in-force decisions to mid-level management without any particular guidance as to the factors to be considered. Admittedly, Defendants ought not be rewarded for senior management's failure to provide such guidance and its apparent inattention to the dictates of federal law in implementing the reduction in force, especially where the jury's finding of willfulness reflects at least a reckless disregard for this law. Yet, apart from the proof of Defendants' unlawful conduct on a single occasion, albeit involving several employees, nothing in the record suggests that subsequent discharge decisions will be made with a similar disregard for the requirements of federal anti-discrimination law. *Compare Wilson Metal Casket*, 24 F.3d at 842 (affirming an award of injunctive relief where "a distinct pattern ... emerged"), *with General Lines*, 865 F.2d at 1565 (declining to award injunctive relief based on a "single occurrence violation").

More generally, Plaintiffs' motion fails to adequately address all of the factors that the Court must consider in deciding whether to award permanent injunctive relief. Among other things, Plaintiffs must demonstrate that their remedies at law are inadequate. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir.1998). In this regard, Plaintiffs offer only their bare assertion, based on a handful of isolated snippets of trial testimony, that Defendants' senior management will continue to disregard the law, absent the imposition of an injunction that requires future compliance with the terms of the ADEA and

grants the Court a continuing role in ensuring this compliance.

The Court finds that the evidence is insufficient to warrant such a conclusion. As to the particular reduction in force at issue here, the Court observes that three of the seven salaried employees who were terminated have obtained sizable damage awards, so that Defendants can hardly be characterized as going "scot-free" despite their ADEA violations. Moreover, because none of the three Plaintiffs has been reinstated, they do not stand to gain from any award of injunctive relief, nor are they subject to further harm if Defendants fail to comply with the law in the future. The Court is reluctant to impose injunctive measures—especially the far-reaching ones proposed by Plaintiffs, which would give the Court a continuing role in Defendants' conduct of their business affairs—that would not accrue to the benefit of the parties actually before it. Finally, and most importantly, the Court is inclined to believe that the aggregate award of $632,936 in monetary relief in this case, plus attorney fees and costs, will suffice to discourage Defendants from any further violations of the ADEA in the future. *See Cancellier v. Federated Dep't Stores*, 672 F.2d 1312, 1320 (9th Cir.1982). Accordingly, the Court declines to grant the injunctive relief sought by Plaintiffs.

## IV. *PLAINTIFFS' MOTION FOR ATTORNEY FEES AND COSTS*

■ In their next motion, Plaintiffs seek an award of attorney fees and costs under § 7(b) of the ADEA, 29 U.S.C. § 626(b).[10] Plaintiffs note that they each prevailed on their ADEA claims, and they have provided an affidavit and fee statement from their counsel, Jaimie R. Goodman, reflecting 895.2 hours of his time devoted to this case at $200 per hour, for a total attorney fee of $179,040.[11] Plaintiffs also have submitted a statement of costs totaling $11,157.33. Finally, Plaintiffs contend that it is appropriate to apply a fee multiplier of 1.5 in this case, in light of their counsel's status as a sole practitioner and his risk, under a contingent fee arrangement with his clients, that he might have received no fee at all if Plaintiffs had not prevailed.

Defendants have adopted an interesting and rather puzzling strategy in opposing Plaintiffs' motion. Initially, they filed a terse response, barely over a page in length, protesting that Plaintiffs' counsel had not yet produced his underlying time records, so that Defendants were unable to confirm the accuracy of counsel's fee statement and verify that it incorporated only the hours spent on Plaintiffs' ADEA claims. In addition, Defendants suggested that Plaintiffs' motion was "premature," in light of the parties' other pending post-trial motions, and that it ought not be addressed until these other matters were resolved. Defendants concluded this initial submission by lodging a generalized "objection" to Plaintiffs' motion, and reserving "their right to file a supplemental brief opposing said motion." This supplemental brief was forthcoming a short while later; it again purported to reserve Defendants' "right to respond to the specific fees and costs sought by Plaintiffs"—presum-

10. This provision incorporates by reference § 16(b) of the Fair Labor Standards Act, 29 U.S.C. § 216(b), which in turn instructs that the Court "shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."

11. According to Plaintiffs and their counsel, this total relates solely to Plaintiffs' claims under the ADEA, and excludes the time spent in pursuing Plaintiff Kulling's wrongful death and loss of consortium claims, both of which were dismissed in a pre-trial Opinion and Order issued on October 1, 2000.

ably through yet another submission to be filed at a future, unspecified date—but also advanced the specific objection that it would be improper to apply any multiplier in computing a fee award under the ADEA.

The Court respectfully declines to adopt Defendants' suggestions as to how and when Plaintiffs' motion should be addressed and resolved. To be sure, if the Court had granted one or both of Defendants' post-trial motions, this would have affected the appropriateness and amount of a fee award. The Court, however, fails to see why Defendants could not offer specific objections to the substance of Plaintiffs' proposed fee award as submitted, notwithstanding their concomitant challenge to the underlying jury verdicts in favor of each Plaintiff. Moreover, to the extent that Plaintiffs' counsel failed to provide certain time records sought by Defendants, their proper recourse was to bring an appropriate motion before the Court, and not to employ the "self-help" of simply refusing to address Plaintiffs' specific fee request.

Accordingly, the Court turns to the merits of Plaintiffs' motion. Plaintiffs' counsel has submitted a detailed, 37–page statement of the hours spent on this case, from the filing of the complaint through the date of trial. The Court's review of this statement has revealed no indications of padding, unnecessary tasks, or inordinate amounts of time devoted to particular tasks, and Defendants have not identified any specific entries that they find objectionable. More generally, the Court finds that the total number of hours spent on this case, 895.2, is reasonable in light of counsel's representation of three clients through discovery, motion practice, and an eight-day trial, and that counsel's billing rate of $200 per hour likewise is reasonable in light of his background and experience in the area of employment law.

Next, the Court finds that several of the factors identified in the case law as relevant to an attorney fee inquiry support the award sought by Plaintiffs here. *See Hamlin v. Charter Twp. of Flint*, 165 F.3d 426, 437 (6th Cir.1999) (outlining twelve factors that may be considered). As noted, counsel was required to devote a substantial amount of time and labor to this case, which was vigorously contested at each stage of the proceedings. Because Plaintiffs' counsel is a sole practitioner, it appears likely, and his affidavit confirms, that he would have been significantly hindered from pursuing other clients and opportunities as a result of his work in this case. Moreover, while Plaintiffs' counsel conducted this litigation on his own, Defendants were represented by two law firms and several attorneys.

Further, as reflected in the Court's lengthy opinion on Defendants' motion for summary judgment, this case has presented a number of close, novel, and difficult questions, both factually and legally. For example, the facts presented at the summary judgment stage did not fit neatly within the analytical framework of a traditional reduction-in-force case. *See Kulling*, 115 F.Supp.2d at 836–40. Additionally, counsel and the Court confronted a question of first impression, with many novel and challenging aspects, in determining whether Plaintiff Kulling could go forward on her wrongful death claim. 115 F.Supp.2d at 841–53. Although Plaintiffs ultimately did not prevail on this issue, it was not for lack of skillful and creative legal argument. Finally, there is no question that Plaintiffs achieved excellent results at trial, with a total jury verdict of $632,936 among the three Plaintiffs. Thus, under a standard one-third contingent fee arrangement, Plaintiffs' counsel would be entitled to a fee in excess of $200,000. In light of all these considerations, the Court concludes that the

$179,040 in fees set forth in counsel's fee statement is a reasonable amount.

Indeed, even as to Plaintiff Kulling's wrongful death claim, counsel's lack of success on this point does not necessarily mandate a reduced fee award. The Supreme Court has explained:

> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention in the lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters.

*Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983) (citation and footnote omitted). In fact, counsel's pursuit of this claim was not entirely for naught, since, as discussed earlier, some evidence of the circumstances surrounding Carl Kulling's death ultimately proved relevant to the determination of damages under Plaintiff Kulling's ADEA claim. In any event, regardless of whether it would be necessary to deduct the time spent in support of the wrongful death claim, Plaintiffs' counsel represents that he has done so, and Defendants have identified no basis for the Court to question this statement, beyond their inability to independently confirm it through inspection of the original billing records.

■ However, the Court agrees with Defendants that a fee multiplier is not warranted. In support of a proposed multiplier of 1.5, Plaintiffs and their counsel point to their contingent fee arrangement, with its attendant risk of non-payment, and to counsel's status as a sole practitioner, and they cite the Sixth Circuit's decision in *Fite v. First Tennessee Production Credit Ass'n*, 861 F.2d 884, 894–95 (6th Cir.1988), as affirming the use of a 1.75 multiplier under analogous circumstances. Yet, as Defendants point out, the Sixth Circuit has disavowed this aspect of *Fite*, in light of the Supreme Court's intervening pronouncement that "enhancement for contingency is not permitted under the [typical federal] fee-shifting statutes." *Davis v. Mutual Life Ins. Co.*, 6 F.3d 367, 381 (6th Cir.1993) (quoting *City of Burlington v. Dague*, 505 U.S. 557, 567, 112 S.Ct. 2638, 2643, 120 L.Ed.2d 449 (1992)). *Davis* expressly precludes any reliance on the two factors cited by Plaintiffs in support of their request for a fee enhancement, explaining that these factors already are taken into account in the calculation of an underlying "lodestar" attorney fee. *See Davis*, 6 F.3d at 381–82. Thus, Plaintiffs have not identified any cognizable basis for a fee enhancement, and the Court cannot say that Plaintiffs achieved extraordinary success that might warrant a multiplier.

Finally, turning to costs, Plaintiffs have submitted an itemized list totaling $11,157.33. Again, Defendants have not objected to any of these items, and the Court's review of this list has failed to identify any unreasonable expenses. The only questionable item concerns Plaintiffs' statistical expert, Nitin V. Paranjpe, whose professional services account for over $4,000 of the total costs. As discussed earlier, and as indicated in the Court's prior Opinion, *see Kulling*, 115 F.Supp.2d at 839, Plaintiffs' statistical evidence has limited probative force, in light of the small sample size of the data. Nevertheless, Plaintiffs did offer this evidence at trial, and the Court has concluded that it was properly admitted, so it cannot be said that this expense was unreasonable or wholly unnecessary. Consequently, the

Court will award attorney fees in the amount of $179,040.00, plus costs in the amount of $11,157.33.

## V.  CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiffs' March 26, 2001 Motion for Injunctive Relief is DENIED. IT IS FURTHER ORDERED that Defendants' March 15, 2001 Renewed Motion for Judgment as a Matter of Law is DE-NIED.  IT IS FURTHER ORDERED that Defendants' March 14, 2001 Motion for New Trial is DENIED.

Finally, IT IS·FURTHER ORDERED that Plaintiffs' March 14, 2001 Motion for Attorney Fees and Costs is GRANTED IN PART and DENIED IN PART. In accordance with this Opinion and Order, Plaintiffs are hereby awarded $179,040.00 in attorney fees and $11,157.00 in costs.